Case number 16-7130, Michelle Rush and Lawanda Britt Appellants v. Federal National Mortgage Association. Mr. Goldsmith for the appellants, Mr. Blonder for the appellate. Good morning, Mr. Goldsmith. Good morning. District Court granted summary judgment against both Ms. Britt and Ms. Rush on their employment retaliation claims against Fannie Mae, but the district court decision should be reversed and remanded for trial. With regard to Ms. Britt, there are two key errors that the district court made. First, in finding that there was no protected activity by Ms. Britt. Considering this court's ruling in Solomon v. Vilsack, Ms. Britt's religious accommodation request clearly sufficed for the necessary protected activity. And in addition, it can also be inferred that the defendant understood her to have engaged in protected activity or activity that may have led them to their motive of retaliation, as will be discussed later on with regard to Ms. Rush. Now, the second error that the district court had was in finding that no reasonable jurors could find other than that Ms. Britt's termination was a legitimate performance-based firing. In fact, there is a considerable amount of timing evidence to indicate that there was no intention whatsoever on Fannie Mae's part to do anything of the sort as to firing Ms. Britt prior to the July 18th to 20th events, including email conversations and then the July 20th memo that Ms. Rush authored on behalf of Ms. Britt. Also, we have the motive evidence, which I think prominent among those pieces are the fact that the two firings were connected in Fannie Mae's documentation. They linked these two individuals who had been separated in terms of any work connection about a year earlier, and nonetheless, on August 7th, three weeks after the July 20th, 18th to 20th events, they had a meeting, took notes, wrote memos about how they were going to fire both of these people and that they were looking for reasons to justify that. There were also numerous impeachments on key items, an amended performance appraisal after the fact for Ms. Rush after she'd been given her performance appraisal, invention of new deficiencies alleged against the employees for the firing. Now, with regard to the issue of tolling, exhaustion, and Ms. Rush, the facts are sufficient to infer that Fannie Mae had a motive to retaliate as it did with Ms. Britt, but as to the tolling, Fannie Mae is asserting that the administrative charge and the lawsuit allegations need to be virtually identical. However, DC Code 2-1403.16 states that where administrative complaint has been withdrawn, a suit may be brought, quote, as if no complaint had been filed. Now, the counsel could have just drafted that where administrative complaints have been withdrawn, the statute of limitations is told, or that it is told for the period during which the administrative complaint was under OHR review, but it did neither such thing. It went further in saying that a lawsuit could be filed on a withdrawn OHR complaint as if no complaint had been filed. But certainly, even if the court were to conclude that there were instances, it could be instances in which the administrative complaint and the court complaint were too disparate from each other, this wouldn't be that sort of a case, because here the conduct was all alleged in both instances. The only issue is with the characterization of the conduct. And in both instances, the conduct was characterized as retaliation, which is forbidden under the statute. The only issue that Fannie Mae is raising there is that in one instance, the conduct was being characterized as retaliatory based on a race complaint as opposed to in the lawsuit retaliatory based on a retaliation complaint. Why isn't that enough of a distinction? Because it's not like it was just inadvertent that one was race and one was religion. They were talking about something different, right? So it's both involved within the characterization of retaliation potentially, but one has to do with retaliation for someone's assertion of a race discrimination claim and another has to do with retaliation for assertion of a religious discrimination claim that was a different one. They are different. And there is a whole body of law, also, of course, under Title VII and EEOC cases dealing with how close they would need to be. And I would submit that in this case, they were close enough. It's important to note that though there is some distinction that can be drawn there, the religious retaliation issue, it does come up. It comes up via a series of steps of one has to look at several different pieces of evidence to understand that it's being alleged initially. But Ms. Rush discussed that with the EEOC investigator or HRC investigator, which is precisely what the Title VII standard would have required anyway. Importantly, the district court ignored the fact that she had added to her charge with an email that talked about the July 20th events. And also that she had that conversation with the counselor, which she was asked about in an arbitration hearing in which she was subject to cross-examination. If there was any questioning about whether it was accurate, that could have been vetted there. So I agree that there's a distinction, but I don't think that the distinction is sufficiently significant that it should trump the plain language of the statute or the fact that if one looks at the various steps that happened here, one sees that the issue was being vetted. In particular, the court should look closely at the check-in requirement. Ms. Rush was required to, through email correspondence on the 18th and 19th, I'm sorry, Ms. Britt was required to check in and tell her superiors about where she was coming and going. And that was a new requirement that she found to be retaliatory in response to her request for religious accommodation, which was discussed at the time. And then Ms. Rush brought that up with the investigator. So that same check-in requirement is what's referenced in the July 20th memo, which is sort of at the center of when we believe that the retaliation really becomes clear and significant and leads to the firing. Indeed, Ms. Wilson admitted that she may have started to work on firing these employees right after that, maybe as early as the next day, July 21st. So as far as that issue goes, that check-in request by management kind of forms a thread that connects the various different issues that occurred. With regard to Ms. Rush's protected activity, first of all, under the statute, if action is being taken against her for having aided or encouraged any other person in the exercise of their rights, then she is protected. That's precisely what Ms. Rush did and what Ms. Wilson did in retaliating against her. And the key evidence there of that violation is Ms. Wilson's admission by impeachment of prior testimony that even she may have interpreted the July 20th memo as being about the Ramadan issue, which had been accommodations and then the check-in. That admission, I would submit, ought to be sufficient to show that the motive to retaliate was present with Ms. Wilson and the exact nature of what Ms. Rush did about it really isn't important. And that's also supported by... What are you referring to that's not important? So under the language of the statute, under the Human Rights Act, and also under the line of cases of Abercrombie District Court decision in Wong and so on, the issue is what was Ms. Wilson's motive in regard to Ms. Rush? Suppose that her motive was unlawful and she's preparing to act unlawfully and then the next day discovers that the employee is stealing and instead is fired for stealing. What's the difference what the motive was with respect to something that was not the cause for termination? I think that's a factual question as to what the individual's motive was. Once there's the double badging in this case. Right. Once you have somebody who's committed a fireable offense, what's the difference whether someone was preparing to discriminate against them? I don't think the record shows Ms. Rush as having been fired for double badging because the decision to fire her... Okay, that's your question, Your Honor. I don't want to confuse the question. The question in an inferential employment discrimination termination is what was the motive. The motive for? For the firing. And then when you have the intervening violation... It could be hypothetically that an intervening violation would become the motive. Having a valid pending charge is not an excuse for then violating other rules that would otherwise result in termination. I agree with that, Your Honor. I think that in this case, though, the important facts with Ms. Rush are that that double badging issue was only... They went to investigate it only after they'd already decided to fire Ms. Rush. In other words, they were looking for a pretext. Well, but is it a pretext if it's an actual violation? I don't think there's any dispute about the double badging. Well, there isn't, but there is a dispute as to whether other people double badged and went out and had breakfast and came back. That's in the record. Now, how could that possibly affect the outcome of this case? Why is that material? The disparate treatment? How is it material? So you'd be showing that not only did they do that, but that the person involved here, Wilson, was aware of it. And was allowing other people to engage in this activity. Right, right. Any evidence of that? Yes, there's evidence in the record that... That Wilson, was it Wilson who did the firing? Wilson and or Meyers. Meyers had to check the record, but... They're aware of this? Yes, I believe they admitted it. So, I understand where Your Honor is going with that. I believe that the ultimate issue is the motive. And that in this case, a reasonable jurist could conclude that the motive for firing Ms. Rush was the activity that Ms. Wilson, in fact, said she was upset about that was protected by Ms. Britt and then by Ms. Rush. I believe my time's been expired, am I right? Thank you. All right, Mr. Blunder. Good morning, may it please the Court. This Court should not reverse Judge Sullivan's decision below because the plaintiffs can't dispute that they were on notice of significant performance issues that led to their termination well before the time of their alleged protected conduct. So, with regard to Ms. Rush, she was given a variety of discipline over a period... Can I just ask you a question about the claims against Rush, which is, what's the jurisdictional basis for bringing in the claims against Rush? So, Ms. Rush has filed a Section 1981 claim, and nominally that's still in the case. I thought all that was left for her were the D.C. claims now. She still has a 1981 claim. The plaintiffs spent, I think, like one page of their brief talking about it. I think they've essentially abandoned it, but nominally it's still in the case. It's part of their brief. It's a race discrimination 1981 claim. So, the Court has jurisdiction over that and then take the independent jurisdiction over the D.C. human rights claims. Okay. So, with regard to Ms. Rush... I'm sorry. The District Court grounded jurisdiction over the claims against Rush based on a different theory? Correct, and that's subsequently been reversed by the Supreme Court, but I think both sides are in agreement that there is still jurisdiction due to the 1981 claim. Okay. With regard to Ms. Rush, she, over a period of five months, before there was any alleged protected conduct, she was given verbal counseling regarding her serial violations of Fannie Mae's attendance policy. She was given email counseling regarding her violations of the attendance policy. She was given a formal memorandum of concern that was placed in her file, and she was given an off track in her midyear review. All of that was directly related to her attendance and timeliness issues, and all of that occurred before the supposed protected conduct. The same thing is true with Ms. Britt. We know that Ms. Britt was aware of her significant performance concerns before the supposed protected conduct, and we know that because she told us. If you look at the memorandum that she provided to her managers at her midyear review, she talks about the fact that she was unable to meet their expectations, and she describes the fact that she felt the expectations that they had of her were unfair. The same is true with the conversation that she had with her previous manager, Ms. Trask, on the day before her midyear review. That conversation, which was memorialized by Ms. Trask in a contemporaneous email, talks about the fact that Ms. Britt didn't care, according to her, what happened during her midyear review because she felt like she was going to be judged unfairly. She talked about the fact that none of the work product that she produced was good enough for her management team, and she talked about the fact that she understood that she was not meeting her manager's expectations. As such, under the McDonnell-Douglas test, Fannie Mae has articulated a non-retaliatory basis for the terminations. So the burden shifts to the plaintiffs to be able to show that they engaged in protected conduct and that the asserted reasons by Fannie Mae were protectual. And under the Supreme Court's holding in Nassar, they must prove that the protectual basis was the but-for cause of the terminations here, and they can do neither of those things. There was no protected conduct here. A review of the primary document that the plaintiff asserts is protected conduct was a memorandum that Ms. Britt provided to her managers at midyear. A review of that document shows that there's nothing in it that talks about discrimination on the basis of religion or Ramadan or her request to change her hours. The entire document relates to the performance concerns that had been articulated to her by her management. And, in fact, Ms. Rush testified under oath that the document was intended to be a defense of Ms. Britt's performance and that the parties had been working on that document for months before the supposed protected conduct occurred. The same thing is true about the conversation Ms. Britt had with Ms. Trask. The context of that conversation was a defense of Britt's performance. The first 15 items in the summary that Ms. Trask drafted in the conversation all relate to Britt's articulated concerns with the performance expectations that had been placed upon her. Now, in addition to the fact that the plaintiffs didn't engage in any protected conduct, the plaintiffs have not shown a shred of evidence to indicate that they fixed the problems that had been identified to them prior to the supposed protected conduct. So Ms. Rush had been coming in late to work, serially violating families' attendance policies. That continued after the protected conduct. Ms. Britt had serious performance concerns that had been identified to her by her management. Those performance concerns continued after the protected conduct. The plaintiffs cannot point to a single disputed fact to indicate that the preexisting problems had been fixed, and, therefore, they can't show that the terminations were pretextual. The fact is Ms. Wilson didn't have any qualms with Ms. Britt's request to change her hours for Ramadan. In fact, the undisputed facts show the contrary is true. When Britt asked Ms. Wilson to change her hours, Britt testified that Wilson's immediate response was, that would be no problem. And then when Wilson learned that Britt needed to go through Fannie Mae's reasonable accommodation request process, the documentation that Ms. Britt submitted to Fannie Mae's religious accommodations coordinator showed that the basis for that request was for her own personal convenience, and so the accommodation was turned down. What Ms. Wilson did when she learned the accommodation was turned down was reach out on her own initiative to her HR business partner, Ms. Gaither, and Fannie Mae's reasonable accommodations coordinator, and ask, did she have the ability, as using her managerial discretion, to change Ms. Britt's hours, even though the accommodation had been turned down by HR? And Ms. Gaither's response was, I don't think you should change her hours, because of the preexisting performance concerns and because of an attendance issue that Ms. Britt had had. Ms. Wilson overruled her HR business partner's advice, and all of this is documented, the request by Ms. Wilson is documented in an email. Ms. Wilson overruled her HR partner's advice and did permit Ms. Britt to change her hours. And Ms. Gaither, her business partner, her HR representative, told her, if you are going to ask her to change her hours, you should make sure you know when she's coming in and when she's leaving for the day, because she's going to be arriving well before you do. So Mr. Goldsmith talked about the critical importance of the requirement that Ms. Britt check in. But that check-in requirement was implemented by Ms. Wilson not as a retaliatory gesture, because she was angry about a request for a religious accommodation. The check-in was based upon the suggestion of her HR representative that if she was going to allow Britt to come in significantly earlier than Wilson arrived, she should know when she was arriving and when she was leaving. The fact is, Wilson wasn't concerned about the accommodation request. Wilson was concerned about Britt's serious performance deficiencies, and the reason is that these performance deficiencies went to the heart of the job that Britt was doing. Wilson was put in place, she has an auditing background, she was put in place because her management team wanted to implement a rigorous compliance background. And the tasks that are undisputed that Ms. Britt was so significantly deficient at that they needed to be taken away from her and given to other people on the team, these tasks were not extra tasks, as the plaintiff derisively characterized them in their brief. These were tasks that went to the core of Ms. Britt's job, because they related to mitigating the risks inherent in safeguarding Fannie Mae's documents, which Britt had responsibility for because she managed Fannie Mae's off-site storage program, where documents were shifted between Fannie Mae's physical locations and off-site storage. So those were the concerns that Ms. Britt, that Ms. Wilson had, not about the accommodation request, but about the performance deficiencies. And with regard to Ms. Rush, her claim was untimely. The claim that she filed with the D.C. Office of Human Resources related to a race retaliation claim that supposedly happened by Ms. Myers, not Ms. Wilson, and it was the protected activity supposedly occurred in May. And this is laid out, it's in the charge she filed, it's on Joint Appendix 1947. You'll see this very detailed as to what the retaliation claim they're talking about is. It's not just a different actor. It's not just a different basis for the retaliation. It's a different complaint that occurred in May, not in July. So that claim is untimely. Ms. Rush did continue to serially violate Fannie Mae's appendix policies. As Judge Bigler noted, Fannie Mae learned that she was fraudulently gaming their badging system. Prior to her being terminated, all of those reasons justified her termination and were not pretextual. And on that basis, Judge Sullivan's decision should be upheld. Thank you very much. Thank you. Does Mr. Goldsmith have any time? All right, why don't you take a minute? I'll stay a minute. Thank you, Your Honor. I think in response to what Mr. Blonder is saying and to Judge Ginsburg's earlier question, one of the things that distinguishes both the cases of Ms. Britt and Ms. Rush is the powerful timing evidence that notwithstanding difficulties in the job, they gave Ms. Britt new duties, they took the duties away, they gave both Ms. Britt and Ms. Rush performance appraisals. And in Ms. Britt's case in particular, right at the 20th, it says she was performing the very same items that they now say warranted her firing in a fully successful manner. And then the next day, they admit, as shown in the record, that they started thinking about firing Ms. Britt anyway. Okay. It's important to note that with what Mr. Blonder said, that he talked about the first 15 steps in the Trask memo, it's important to note that the items that Ms. Trask writes about her conversation with Ms. Britt after those relate to the Ramadan dispute. It's also important to note that the statute, the Human Rights Act, does not distinguish race retaliation from religious retaliation. There are a number of types of conduct that are made unlawful by the statute, such as race discrimination, sex discrimination, et cetera, and then retaliation is forbidden. And I'd also like to note, in response to something that Mr. Blonder said, that as far as what the standard is that this court is to apply, as I understand it, it is a de novo review of a summary judgment decision, and the standard for summary judgment is whether a reasonable jury could find that the elements of a claim of employment retaliation were met, including the pretext element, and there is nothing more that at this stage of the proceeding that this court needs to consider. There isn't an elevated standard that the Nassar case creates for a summary judgment proceeding. Mr. Goldsmith, we have your argument. Thank you so much. I appreciate the court's time.
judges: Henderson, Srinivasan, Ginsburg